62182. SMITH et al. v. HOSPITAL AUTHORITY OF WALKER, DADE AND CATOOSA COUNTIES.

POPE, Judge.

Claude Smith and his wife Shirley brought suit against the Hospital Authority seeking damages for alleged negligent acts committed by its technicians, nurses, employees and agents in administering medical treatment or conducting medical procedures while extracting blood from Smith, as a direct result of which he sustained serious and permanent injury to the median nerve of his left arm. The Hospital Authority responded, denying liability, and moved to dismiss the complaint on the grounds that Smith voluntarily agreed to the withdrawal of his blood as a donor to the blood bank to be credited to a patient confined in the hospital; that at the time of doing so, Smith executed a written agreement and release by the terms of which the Hospital Authority, as the blood collection agency, and any of its technicians, nurses, agents or officers participating in the withdrawal of his blood were all jointly and severally released from any consequences or liabilities to Smith from injury resulting from the withdrawal, tests, examinations or any procedure incident thereto; and that Smith thereby released the Hospital Authority from any claims or demands which he had against it or any of those participating in the withdrawal. The trial court held that the release constituted a bar to the prosecution of the suit; appeal is taken from the order granting the Hospital Authority's motion to dismiss.

Appellants contend that reversal is mandated by the recent decision of this court in *Porubiansky v. Emory University,* 156 Ga. App. 602 (275 SE2d 163) (1980), affd., *Emory University v.*

*Porubiansky,* 248 Ga. 391 (282 SE2d 903) (1981), which held that a release clause similar to the one in the instant case was violative of public policy and would not shield a dental clinic from its negligent acts in furnishing medical services. The Hospital Authority argues that *Porubiansky* is inapplicable here because (1) exculpatory releases in agreements other than those involving the practice of learned professions are ordinarily valid, and the removal of blood from a voluntary donor is not a process which requires a licensed professional to perform it; and (2) an agency for the collection of blood should be exempt from considerations of public policy since the donor generally has the superior bargaining position due to the known scarcity of blood for which the agency, as a mere conduit of the blood for the benefit of a third person, often has to pay.

The Hospital Authority's response sets forth the following facts concerning the laboratory procedures. On March 5, 1978 Smith was interviewed by Cathy Wilson, "a qualified medical laboratory technician (ASCP)" at the hospital, as a prospective donor of blood for a patient. Qualifying questions were asked Smith and he was accepted as a donor on the conditions stated in the release agreement, which he executed. Veta Kirk, a "qualified phlebotomist, with long experience in blood extraction procedures, punctured the vein in [Smith's] left arm, successfully inserting the needle in the brachial vein near the median cubital area. The blood flow was not free because of the small size of the vein, and Ms. Kirk with Cathy Wilson, Medical Laboratory Technician assisting, decided to and did discontinue the extraction in the left arm and shifted to the right arm where the vein was much larger and completed the extraction without difficulty, obtaining 450 cc of blood. Shirley Harris, Certified Laboratory Assistant (ASCP) assisted in the withdrawal procedure . . .

"During the withdrawal procedure, there was a licensed supervisor on duty. The personnel performing the venipuncture procedures followed strictly the procedure for interviewing the donor and obtaining the blood promulgated by the American Association of Blood Banks, in which Association [the Hospital Authority] holds an institutional membership. This Association has inspected and licensed [the Hospital Authority's] blood bank to conduct venipunctures and accept donations for use, not only in Georgia, but in interstate commerce throughout the United States."

The Hospital Authority's answers to interrogatories through John Weaver, the Technical Director of the Laboratory, and depositions of all persons working in the blood bank, further established that these procedures were carried out by qualified, competent, trained and experienced technologists and technicians. It

thus appears that the personnel working in the subject blood bank were all licensed as required by state law for such clinical laboratories, and the Hospital Authority's vague and conclusory arguments to the contrary are unfounded. See Code Ann. Chs. 84-55 (Clinical Laboratories) and 84-10 (Nurses).

This court in *Porubiansky v. Emory University,* supra at 607, adopted the following criteria to use in declaring an exculpatory provision shielding a hospital from liability invalid: "(1) It concerns a business of a type generally thought suitable for public regulation. (2) The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. (3) The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. (4) As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. (5) In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. (6) Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents."

We think the blood bank operated by the hospital comes palpably within the contemplation of this test. The exculpatory clause was placed in small print on the back of an information sheet given out before blood was to be removed, and there was no provision for a donor to obtain protection against negligence. We are unconvinced that merely because a donor (or even a payee) rather than a purchaser may be involved, the blood bank possesses a less decisive advantage of bargaining strength or that the donor is placed less under its control. The hospital is open to the general public and the securing of blood is a service of great importance to the public. Because blood secured from donors may be credited to patients to defray their hospital expenses, the blood collection service is for some members of the public a matter of practical necessity. Particularly, as in Smith's case, where the donor is requested by members of the family to donate blood for an ailing relative, the hospital very definitely possesses a decisive advantage in bargaining strength against a member of the public who seeks its services. Once a donor is accepted (medical reasons rule out some donors) his person is unquestionably placed under the control of the hospital personnel

operating the laboratory, and he must rely upon their professional skills as in any other hospital-patient relationship.

We see no reason why a federally and state regulated agency of a hospital which collects blood from donors for the benefit of its patients should be permitted to relieve itself from liability simply because it is not paid for these medical services. As stated by our Supreme Court in *Emory University v. Porubiansky,* supra at 394: " '[R]ules that govern tradesmen in the market place are of little relevancy in dealing with professional persons who hold themselves out as experts and whose practice is regulated by the state.'

". . . 'The law imposes upon persons of professional standing performing medical . . . and like skilled services, pursuant to their contracts with their clients, an obligation to exercise a reasonable degree of care, skill and ability, such as is ordinarily exercised under similar conditions and like circumstances by persons employed in the same or similar professions . . . This is a duty apart from any express contractual obligation.' [Cit.] The relationship of the parties is relevant in determining whether or not a contract is in contravention of public policy because 'some relationships are such that once entered upon they involve a status requiring of one party greater responsibility than that required of the ordinary person, and therefore, a provision avoiding liablility is peculiarly obnoxious.' [Cit.] . . . .

"We do not hold that licensed professionals may not enter into binding contracts with their patients and clients. Nor do we infer that such contracts might shift certain obligations which would otherwise arise in the relationship. However, we do conclude that the release used in the present case may not relieve the practitioner from the duty to exercise reasonable care and skill in the performance of his practice. Consequently, the attempt to plead the signing of the agreement as a complete defense to this action must fail." If appellants can establish the requisite showing of negligence on the part of the Hospital Authority, they should be allowed to recover appropriate damages.

*Judgment reversed. Quillian, C. J., and McMurray, P. J., concur.*

DECIDED NOVEMBER 16, 1981.

*Christopher A. Townley,* for appellants.
*Frank M. Gleason, John W. Davis, Jr.,* for appellee.