TJOFLAT, Circuit Judge:
The investing public is concerned with two factors when confronted with a business opportunity: risk and reward. This point was underscored in a recent case in this Court. See Commodity Futures Trading Comm’n v. R.J. Fitzgerald & Co., 310 F.3d 1321(11th Cir.2002). There, we held that the defendant made misleading statements when it spoke of “unlimited profit potential” and ways to “limit risk” while, in fact, 95% of the firm’s customers lost money on its proposed investments. The representations created a picture of the risk-to-reward ratio that, when compared to reality, was heavily distorted.
The focus in that case was on the risk variable. In this case, we turn to the other variable: reward. The Federal Trade Commission (“FTC”) contends that the defendants misrepresented the potential profit that customers could expect to earn from their telephone card dispensing machines, thereby violating section 5 of the Federal Trade Commission Act (“FTCA”), 15 U.S.C. § 45, in addition to the FTC’s Franchise Rules, 16 C.F.R. §§ 436.1 et seq. After a six-day bench trial, the district court entered judgment in favor of the defendants. We reverse and render judgment in favor of the FTC.
I.
Stephen Tashman was in the business of selling “business opportunities” to hopeful entrepreneurs. Tashman sold machines that dispensed phone cards[1] (and the phone cards that go in them) through the corporation that he controlled, Telecard Dispensing Corp. (“TDC”).[2] The record points to an intricate web of sales pitches by the defendants that ultimately consisted of untruthful, baseless assertions. First, TDC attempted to lure customers through radio advertisements which asked listeners the following question: “Do you really want to make more money — an additional twenty-five to thirty-five thousand dollars a year or more, possibly a lot more, and only work three to five hours per week?” The advertisement went on to proclaim that “[w]ith a very small investment you can make $600 to $700 a week or more— maybe a lot more — working as little as five hours a week.” The advertisement con- *1276 eluded: “Stop the excuses. You can do it. You can change your life.”
Spurred by the specter of “a lot more” than $140 per hour and the admonishment to “stop excuses,” who could resist the temptation to call TDC? Upon making the phone call, prospective customers spoke to a telemarketer, known as a “fronter,” who would read a script in which mathematical figures were thrown around in an effort to “get down to the nuts and bolts and talk about the money being made in this industry.” This conversation included claims that (1) TDC’s “locators” would put machines in public places experiencing a traffic flow of at least 500 persons per day; (2) 2% of passersby, according to TDC’s “experience,” are likely to purchase phone cards from the machines; and (3) entrepreneurs could be “expected” to pay off their machines[3] in about six months. Prospective customers were then sent “disclosure statements” which reinforced the rosy picture painted by the defendants. The disclosures stated, for example, that TDC received 287 positive letters and only twenty negative ones. TDC also encouraged prospective customers to speak to “references” who would give first-hand testimony of the profit potential in the phone card dispensing business.
Unfortunately for TDC’s customers, TDC had no basis for many of its claims. The claim that customers could “expect” to pay off their machines in six months, for example, was in turn based upon two untrue claims: that (1) 500 people per day would pass by the machines and (2) 2% of passersby would purchase cards. In fact, neither claim is true. TDC’s “locators” were paid to put machines in any location, and many locations did not have foot traffic at a rate of 500 per day. Moreover, the 2% figure was completely made up. The record shows that the defendants once ran an experiment which, to the defendants’ chagrin, showed that the machine made no sales whatsoever. The defendants then decided to borrow the usage rate from an unrelated business — vending machines in which people can attempt to catch stuffed animals with a mechanical crane. Compounding this misrepresentation, the radio advertisement, in conjunction with the disclosure statements and the telemarketers’ emphasis on the “nuts and bolts of the money being made in the industry,” created an impression that most customers were reaping nice profits and, on the whole, very satisfied. The record points to a quite different conclusion: few of the customers who bought machines made significant returns and most did not even recoup their original investment. The FTC put forward fourteen witnesses who claimed to have lost substantial sums in rebanee on TDC’s representations.[4] TDC, on the other hand, used four witnesses— only one of which was a customer who claimed to have made a profit, and his testimony on this point is somewhat suspect.[5] Moreover, some of the “references” never owned phone card vending machines, and all of them were paid to serve as references. Finaby, the disclosure statements failed to report that TDC received twenty to thirty calls per day complaining about sluggish phone card sales— hardly the portrait of customer satisfaction and profitability painted by TDC.
*1277 II.
To establish liability under section 5 of the FTCA, the FTC must establish that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material. FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir.1988); FTC v. Atlantex Assocs., 1987-2 Trade Cas. (CCH) ¶ 67,788 at 59,252, 1987 WL 20384 (S.D.Fla.1987), aff'd, 872 F.2d 966 (11th Cir.1989). The defendants concede that the first and third elements have been established; they dispute only the second element. The undisputed evidence shows, however, that TDC had no basis for the representations it made. How, for example, could it claim that 2% of passersby would purchase phone cards when the only data TDC utilized was based upon an entirely different product? One searches in vain for the district court’s analysis on whether particular assertions were likely to mislead. In its findings of fact and conclusions of law, for example, the court jumped from a correct recitation of the legal standard to a discussion of irrelevant points such as the fact that the business was “new” and the fact that “migrant workers” might buy the cards,[6] leading the court to conclude that “[i]t was therefore up to the potential customers to weigh the risks and profit potential, and to follow up their investment with the hard work and business savvy necessary to make the venture successful and profitable.”[7] With regard to the second point, no one doubts the utility of phone cards or claims that the product is a scam; all that is at issue are the statements made by the defendants. As for the first point, there is no “new business” immunity from the Federal Trade Commission Act. See, e.g., FTC v. Wolf, 1997-1 Trade Cas. (CCH) ¶ 71,713, 1996 WL 812940 (S.D.Fla.1996), aff'd, 113 F.3d 1251 (11th Cir.1997) (holding that defendants had violated section 5 by making false representations regarding earnings that consumers could expect from hot pizza vending machine business opportunities). Indeed, it is precisely in the context of a new venture that investors are unlikely to have their own data. In the “new business” setting, investors are the most vulnerable to the representations and purported “expertise” of those in the business of selling novel business opportunities. Finally, caveat emptor is simply not the law, and the district court’s conclusion to the contrary is incorrect.
The district court even seemed to concede that misrepresentations were made. In its findings of fact and conclusions of law, it held that “reasonable potential customers would not have believed that they could make tens of thousands of dollars while working only three to four hours per week.” The FTCA does not have an “extravagant claim” defense.[8] Moreover, this was only one of many misrepresentations made by TDC.
*1278 In short, the record contains overwhelming evidence that misrepresentations were made and that reasonable consumers were likely to (and, in fact, did) rely on those statements. Rather than analyzing those statements, the court focused on a few satisfied customers, the utility of the product being sold, and why the government ought not protect consumers from what it perceived as a lack of “hard work” and “walking around common sense.” The district court’s legal conclusions are incorrect, and its findings of fact are clearly erroneous.
III.
Count five of the FTC’s complaint alleges that the defendants violated the FTC’s Franchise Rule.[9] Section 436.1(b) of the Rule, 16 C.F.R. § 436.1(b)(2), states that if a franchisor makes any representation to a prospective franchisee regarding “a specific level of potential sales, income, gross or net profit for that prospective franchisee, or which states other facts which suggest such a specific level,” then the franchisor must have a “reasonable basis” for the representation which must be disclosed. In this case, there is no question that the defendants’ many representations (such as the 2% claim) lacked any reasonable basis in fact. The disclosure statements did not provide a “reasonable basis” for the claims. Rather, they merely added to the deceit by supplying testimonials of satisfied customers without saying that twenty to thirty calls per day were made by disgruntled customers. The district court ignored this count entirely when, in fact, it should have entered judgment in favor of the FTC.
IV.
For the forgoing reasons, the judgment of the district court is VACATED and the case is REMANDED for the entry of judgment in favor of the FTC. On remand, the district court should fashion appropriate monetary and injunctive relief.[10]

. In order to get the attention of passersby, the machines would “speak” the following message: “Hi there! Get your long distance phone card and call anywhere, anytime, from any touchtone phone without a penny in your pocket and save up to 50%. Buy it here, buy it now.”

. Tashman and his corporation, TDC, are hereinafter called “the defendants.”

. Each vending machine had a cost of approximately $5,500; customers were encouraged to purchase two machines.

. The FTC proffered many more witnesses, but the district court instructed the FTC that additional witnesses would be unnecessary.

.Half of the witness's machines were purchased from other sources. These machines had four times the capacity of the machines purchased from the defendant.

. At oral argument before the district court, the court similarly expounded upon the virtues of phone cards, drawing an analogy to the high risk/high reward environment of cellular phone technology a decade ago.

. Perhaps reflecting its caveat emptor sentiment, the district court stated: “If a deal sounds too good to be true, it probably isn’t true. But that is not necessarily a fraud. [The] FTC cannot protect everyone from their own lack of walking around common sense.” And again: “[T]he government cannot be a big brother and just interfere in every relationship and restore things back to where they started. People have to be responsible for walking around common sense.”

.The defendant does not argue that reliance upon the representations were "unreasonable"; rather, it claims that reliance upon them was entirely reasonable precisely because the statements were truthful.

. Defendants admit that the business opportunities they sell are "franchises” within the meaning of the regulations.

. The parties stipulated that an injunction should have been granted on another count in which the court entered judgment in favor of the FTC. (The district court found that Tash-man violated the Franchise Rule when he failed to list his name on the disclosure documents — information that TDC's customers might have found useful given the fact that Tashman had a $12 million judgment against him in another FTC matter and was under investigation by the SEC.) The district court never entered the injunction, however, and both parties agree that this was a "clerical error.”