141 P.3d 427

Lisa COURBAT and Steven Courbat,
Plaintiffs–Appellants,

v.

DAHANA RANCH, INC.,
Defendant–Appellee,

and

John Does 1–10, Jane Does 1–10, Doe Associations 1–10, Doe Partnerships 1–10, Doe Corporations 1–10, Doe Entities 1–10, and Doe Governmental Units 1–5, Defendants.

No. 25151.

Supreme Court of Hawai'i.

July 10, 2006.

As amended on grant of reconsideration in part Aug. 3, 2006.*

* STATEMENT OF NO POSITION (by Associate Justices Acoba and Duffy).

For the reasons stated in our dissenting opinion, we take no position on the motion for reconsideration of the published opinion filed on July 10, 2006.

Andrew S. Iwashita, Hilo, on the briefs, for the plaintiffs-appellants Lisa Courbat and Steven Courbat.

Zale T. Okazaki, of Ayabe, Chong, Nishimoto, Sia and Nakamura, Honolulu, on the briefs, for the defendant-appellee Dahana Ranch, Inc.

MOON, C.J., LEVINSON and NAKAYAMA, JJ., and DUFFY, J., dissenting, with whom ACOBA, J. joins.

Opinion of the Court by LEVINSON, J.

The plaintiffs-appellants Lisa Courbat and Steven Courbat [hereinafter, collectively, "the Courbats"] appeal from the May 13, 2002 judgment of the circuit court of the third circuit, the Honorable Riki May Amano presiding, entered pursuant to the circuit

court's April 26, 2002 grant of summary judgment in favor of the defendant-appellee Dahana Ranch, Inc. (the Ranch).

On appeal, the Courbats contend that the circuit court erred: (1) in concluding that Hawai'i Revised Statutes (HRS) § 480–2 *et*

1. HRS ch. 480 provided in relevant part:

 § 480–2 .... (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

 (b) In construing this section, the courts and the office of consumer protection shall give due consideration to the rules, regulations, and decisions of the Federal Trade Commission and the federal courts interpreting section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.
 ....

 § 480–3 .... This chapter shall be construed in accordance with judicial interpretations of similar federal antitrust statutes....
 ....

 § 480–12 .... Any contract or agreement in violation of this chapter is void and is not enforceable at law or in equity.

 § 480–13 .... (b) Any consumer who is injured by any unfair or deceptive act or practice forbidden or declared unlawful by section 480–2:

 (1) May sue for damages sustained by the consumer, and, if the judgment is for the plaintiff, the plaintiff shall be awarded a sum not less than $1,000 or threefold damages by the plaintiff sustained, whichever sum is the greater, and reasonable attorneys' fees together with the costs of suit; ... and

 (2) May bring proceedings to enjoin the unlawful practices, and if the decree is for the plaintiff, the plaintiff shall be awarded reasonable attorneys' fees together with the cost of suit.

 Effective June 28, 2002, HRS § 480–2 was amended in respects immaterial to the present matter. *See* 2002 Haw. Sess. L. Act 229, §§ 2 and 6 at 916–18. Effective May 2, 2001, June 28, 2002, and June 7, 2005, HRS § 480–13 was amended in respects immaterial to the present matter. *See* 2005 Haw. Sess. L. Act 108, §§ 3 and 5 at 265–66, 267; 2002 Haw. Sess. L. Act 229, §§ 3 and 6 at 917–18; 2001 Haw. Sess. L. Act 79, §§ 1 and 5 at 127–28.

2. HRS ch. 663B, entitled "Equine activities" and enacted in 1994, *see* 1994 Haw. Sess. L. Act 229, §§ 1 and 2 at 591–92, provides in relevant part:

 § 663B–1 .... As used in this [chapter], unless the context otherwise requires:

 "Engages in an equine activity" means riding ... or being a passenger upon an equine....

seq. (Supp.1998)[1] do not apply to the Ranch's business practices of booking pre-paid tours and subsequently requiring liability waivers upon check-in; (2) by applying the rebuttable presumption set forth in HRS § 663B–2(a) (Supp.1994)[2] in finding that

....

"Equine activity" means:

....

(5) Rides, trips, hunts, or other equine activities of any type however informal or impromptu that are sponsored by an equine activity sponsor; and

....

"Equine activity sponsor" means an individual, group, club, partnership, or corporation ... which sponsors, organizes, or provides the facilities for, an equine activity....

"Equine professional" means a person engaged for compensation in instructing a participant or renting to a participant an equine for the purpose of riding, driving, or being a passenger upon the equine, or in renting equipment or tack to a participant.

"Inherent risks of equine activities" means those dangers or conditions which are an integral part of equine activities, including, but not limited to:

(1) The propensity of an equine to behave in ways that may result in injury, harm, or death to persons on or around them;

(2) The unpredictability of an equine's reaction to such things as sounds, sudden movement, and unfamiliar objects, persons, or other animals;

(3) Certain hazards such as surface and subsurface conditions;

(4) Collisions with other equines or objects; and

(5) The potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, such as failing to maintain control over the animal or not acting within the participant's ability.

"Participant" means any person, whether amateur or professional, who engages in an equine activity, whether or not a fee is paid to participate in the equine activity.

§ 663B–2 .... (a) In any civil action for injury, loss, damage, or death of a participant, there shall be a presumption that the injury, loss, damage, or death was not caused by the negligence of . an equine activity sponsor, equine professional, or their employees or agents, if the injury, loss, damage, or death was caused solely by the inherent risk and unpredictable nature of the equine. An injured person or their legal representative may rebut the presumption of no negligence by a preponderance of the evidence.

(b) Nothing in this section shall prevent or limit the liability of an equine activity sponsor,

Lisa's injuries were not due to the negligence of the tour operator; (3) in finding that the Courbats sufficiently read over the waiver before signing it; and (4) in concluding that the waiver was valid as to their negligence claims.

For the reasons discussed *infra* in section III.A, we vacate the circuit court's May 13, 2002 judgment and remand for further proceedings consistent with this opinion.

## I. *BACKGROUND*

The present matter arises out of personal injuries sustained by Lisa on February 1, 1999, while she and Steven were on a horseback riding tour on the Dahana Ranch on the Big Island of Hawai'i. The Courbats had booked the tour and prepaid the fee several months earlier through Island Incentives, Inc., an internet-based tour organizer. When they checked in at the Ranch, the Courbats were presented with a document to review and to sign which laid out the rules for the horseback tour and included a waiver "releas[ing] and hold[ing] harmless ... [the] Ranch ... from ... injury to myself ... resulting from my ... being a spectator or participant or while engaged in any such activity in the event[-]related facilities" and stating that the undersigned "acknowledge[s] that there are significant elements of risk in any adventure, sport, or activity associated with horses."[3] According to admissions by the Courbats in subsequent depositions, Lisa read over the waiver and, having no questions regarding the rules and regulations it contained, signed it before passing it to her husband to sign. Steven evidently did not read it, but recognized that it was "some kind of release of some sort" and signed it. In fact, no guest of the Ranch had ever refused to sign a waiver. Steven was familiar with the concept of such waivers, having participated with his wife in a snorkeling activity earlier during the vacation, at which time they both signed similar forms.

The Ranch's guide, Daniel Nakoa, briefed the Courbats on how to handle a horse and general rules of the trail, including the importance of not riding single-file or allowing the horses to bunch up end to end. Out on the ride, Lisa was injured when she rode up behind Nakoa's horse while Nakoa was speaking with another guest who had approached Nakoa with a question. According to later statements by both Nakoa and Lisa, Lisa approached Nakoa's horse from the rear while the three horses were in motion, and, when her horse neared Nakoa's horse, Nakoa's horse struck out at her horse, hitting Lisa in the left shin. Lisa described the incident in a deposition taken on November 3, 2001:

Q: At what point did you believe that you needed to pull the reins back as you were approaching the guide ... ? ...

 ....

● DO NOT FOLLOW ONE ANOTHER

 ....

WAIVER

I/We, the undersigned, hereby release and hold harmless the land owners, managers, operators (William P. Kalawai'anui, Daniel H. Nakoa, Dahana Ranch and Nakoa Ranch), [t]he State of Hawai['i]i and the Department of Hawaiian Home Lands and all other persons directly related to those listed above for the event listed herein[,] their successors, assigns and affiliates from loss or damage to property or injury to myself or any person ... resulting from my ... being a spectator or participant or while engaged in any such activity in the event[-] related facilities. I/We acknowledge that there are significant elements of risk in any adventure, sport or activity associated with horses.
I/WE HAVE READ AND UNDERSTOOD THE FOREGOING RULES, REGULATIONS AND WAIVER.
(Emphasis in original.)

an equine professional, or their employees or agents if the equine activity sponsor, equine professional, or person:
 ....
 (2) Provided the equine and ... failed to reasonably supervise the equine activities and such failure is a proximate cause of the injury....
(Some brackets in original and some omitted.)

3. The rules and waiver stated in pertinent part:
 In order for us to keep our ride from being a "Nose To Tail Trail Ride[,"] there are certain rules which must be followed for your safety and the horses' mental well being. *FAILURE TO FOLLOW THESE RULES WILL RESULT IN FORFEITURE OF YOUR RIDE WITH NO REFUND.*
*RULES AND REGULATIONS*
● FOLLOW RIDING INSTRUCTIONS & DIRECTIONS THROUGHOUT THE RIDE
 ....
● PLEASE DO NOT RIDE AHEAD OF YOUR GUIDE UNLESS TOLD TO DO SO

[Lisa]: When I felt that the horse[ ] was getting too close to the horses above me.

Q: So it appeared to you that the nose end of the horse was getting too close to the butt end of the horse in front?

[Lisa]: To the horse in general. We were coming in. I was just trying to keep a certain space between myself and the horse.

Q: [T]hose two horses, the guide's horse and the guest's horse, they were to the left of your horse, is that correct, to the front left of you?

[Lisa]: Yes.

Q: You recall which hind leg of the horse kicked you? Was it the right or the left?

[Lisa]: It would be the right one.

Q: And that was a horse which was ridden by the guide or the guest?

[Lisa]: The guide.

Q: Just before the horse in front of you kicked you, were all of the horses still in motion? When I say "all the horses," yours, the guide's, and the guest that was riding parallel to the guide?

[Lisa]: Just before?

Q: Yes.

[Lisa]: Yes.

Q: Was there any conversation between you and the guide or the guest just before this kicking incident occurred?

[Lisa]: No.

Q: At the time this kicking incident occurred, w[ere] the guide and the guest still talking to each other?

[Lisa]: Yes.

Nakoa described the same incident in a January 9, 2002 deposition:

[Nakoa]: ... Everybody was facing the gate, the second gate.... And I was in the back. And because I lots of times don't want to be a part of the ride, I started riding to the right. And then a man came to talk to me and ask me about the horse.

. . . .

Q: On which side of your horse was he at the time?

[Nakoa]: He was on the left side of me.

Q: And were you still moving or were you stopped?

[Nakoa]: We were walking.

. . . .

Q: ... [H]ad you passed Lisa along the way?....

[Nakoa]: Because of the angle, she was off to my left.

Q: Still in front of you?

[Nakoa]: No. About the same.

. . . .

Q: And when is the next time you notice[ ] Lisa's horse before the injury takes place?

. . . .

[Nakoa]: She was still on the left side of me.

Q: ... [A]bout how far away do you estimate she was from your horse?

[Nakoa]: You know, 30 feet maybe....

Q: And from that point on, ... were you able to continually observe Lisa riding her horse until the time the injury occurred?

[Nakoa]: Yes. The man was on my left and I was talking to him.

. . . .

Q: ... [W]hile [the guest is] asking you this question and you can see [Lisa], what is her horse doing as it's approaching your horse?

[Nakoa]: No, I didn't see her approaching my horse. That's what I'm trying to tell you. She was on the left side of this man and me and we're all going in that direction (indicating). She was trotting, and I was walking with this man. And I saw her. And then this man asked me something. And the next thing I knew, she was right in back of my horse telling me that my horse kicked her.

Nakoa later acknowledged in the deposition that, if he or his horse had been aware that Lisa's horse was approaching from behind, his horse would not have been surprised and would not have struck out at her horse. As a result of the impact, Lisa suffered severe pain and swelling, but no broken bones, and

since the incident has complained of ongoing pain and injury to her leg.

The Courbats filed suit on January 31, 2001, asserting claims of negligence and gross negligence that resulted in physical injury to Lisa and loss of consortium injuries to Steven. On November 21, 2001, they filed a first amended complaint, adding a claim of unfair and deceptive trade practices regarding the waiver they had signed the day of the ride.

On January 16, 2002, the Ranch filed a motion for summary judgment on the grounds: (1) that the Courbats had assumed the risk of the activity; (2) that the Courbats had waived their rights to sue the Ranch for negligence; and (3) that the Ranch had not committed any acts that brought it under the purview of HRS §§ 480–2 and 480–13, *see supra* note 1.

The Courbats filed a memorandum in opposition to the Ranch's motion and a motion for partial summary judgment, urging the circuit court to rule, *inter alia:* (1) that the Ranch owed Lisa a duty to protect her from injury by Nakoa's horse; and (2) that the rebuttable presumption of no negligence on a defendant's part set forth in HRS § 663B–2, *see supra* note 2, was inapplicable.

The circuit court conducted a hearing on both motions on February 13, 2002 and, on April 26, 2002, entered an order granting the Ranch's motion and denying the Courbats' motion. On May 13, 2002, the circuit court entered a final judgment in favor of the Ranch and against the Courbats. On August 8, 2002, the Courbats filed a timely notice of appeal.[4]

## II. STANDARDS OF REVIEW

### A. Summary Judgment

 We review the circuit court's grant or denial of summary judgment *de novo.* . . .

[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

[*Hawai'i Cmty. Fed. Credit Union v. Keka,* 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000)] (citations and internal quotation marks omitted).

*Querubin v. Thronas,* 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (quoting *Durette v. Aloha Plastic Recycling, Inc.,* 105 Hawai'i 490, 501, 100 P.3d 60, 71 (2004)) (internal citation omitted) (some brackets in original).

### B. Interpretation Of Statutes

 The interpretation of a statute is a question of law reviewable *de novo. State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996).

Furthermore, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncer-

4. On May 10, 2002, the Ranch filed a notice of taxation of costs which, pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 4(a)(3), tolled the time for filing an appeal. An order as to taxation of costs was never entered, and so, pursuant to HRAP Rule 4(a)(3), the request was deemed denied 90 days later, on August 8, 2002. The Courbats' appeal, filed prematurely on June 7, 2002, was therefore timely filed as of August 8, 2002, pursuant to HRAP Rule 4(a)(2) and (3).

tainty of an expression used in a statute, an ambiguity exists....

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray [v. Admin. Dir. of the Court],* 84 Hawai'i [138,] 148, 931 P.2d [580,] 590 [ (1997) ] (footnote omitted).

*State v. Koch,* 107 Hawai'i 215, 220, 112 P.3d 69, 74 (2005) (quoting *State v. Kaua,* 102 Hawai'i 1, 7–8, 72 P.3d 473, 479–480 (2003)). Absent an absurd or unjust result, *see State v. Haugen,* 104 Hawai'i 71, 77, 85 P.3d 178, 184 (2004), this court is bound to give effect to the plain meaning of unambiguous statutory language; we may only resort to the use of legislative history when interpreting an ambiguous statute. *State v. Valdivia,* 95 Hawai'i 465, 472, 24 P.3d 661, 668 (2001).

### III. *DISCUSSION*

A. *Inasmuch As The Presence Or Absence Of An Unfair Or Deceptive Trade Practice Is For The Trier Of Fact To Determine, The Circuit Court Erroneously Granted Summary Judgment In Favor Of The Ranch And Against The Courbats.*

■ The Courbats do not dispute that they both signed the Ranch's waiver form, *see supra* note 3, prior to their ride. Nor do they dispute that waivers are an accepted method by which businesses may limit their liability. Rather, they assert that the Ranch's practice of booking ride reservations through an activity company, receiving payment prior to the arrival of the guest, and then, upon the guest's arrival at the Ranch, requiring the guest to sign a liability waiver as a precondition to horseback riding is an unfair and deceptive business practice to which the remedies of HRS ch. 480 apply. The Courbats maintain, *inter alia,* that the practice of withholding the waiver had "the

capacity or tendency to mislead" customers, thereby satisfying this court's test for a deceptive trade practice as articulated in *State ex rel. Bronster v. United States Steel Corp.,* 82 Hawai'i 32, 50, 919 P.2d 294, 312 (1996).

The Intermediate Court of Appeals held in *Beerman v. Toro,* 1 Haw.App. 111, 118, 615 P.2d 749, 754–55 (1980), that the remedies afforded by HRS ch. 480 are not available for personal injury claims. *See also Blowers v. Eli Lilly & Co.,* 100 F.Supp.2d 1265, 1269–70 (D.Haw.2000). The Courbats, however, assert that they are not invoking HRS ch. 480 for the purpose of establishing personal injury damages, but rather because the lack of notice as to the waiver requirement injured them economically, by way of the $116 cost of the tour, giving rise to a valid claim under HRS § 480–13, *see supra* note 1. As a deceptive trade practice, the Courbats maintain, the waiver is void under HRS § 480–12, *see supra* note 1.

1. *The elements of a deceptive trade practice claim for rescission of a contract*

To render the waiver void, the Courbats must establish that it is an unseverable part of a "contract or agreement in violation of [HRS ch. 480]." *See* HRS § 480–12, *supra* note 1. Furthermore, any "unfair or deceptive act[ ] or practice[ ] in the conduct of any trade or commerce" violates HRS § 480–2.

"Deceptive" acts or practices violate HRS § 480–2, but HRS ch. 480 contains no statutory definition of "deceptive." This court has described a deceptive practice as having "the capacity or tendency to mislead or deceive," *United States Steel Corp.,* 82 Hawai'i at 50, 919 P.2d at 312, 313, but, beyond noting that federal cases have also defined deception "as an act causing, as a natural and probable result, a person to do that which he [or she] would not do otherwise," *Keka,* 94 Hawai'i at 228, 11 P.3d at 16 (brackets in original) (quoting *United States Steel Corp.,* 82 Hawai'i at 51, 919 P.2d at 313 (citing *Bockenstette v. Federal Trade Comm'n,* 134 F.2d 369 (10th Cir.1943))), we have not articulated a more refined test.

■ HRS § 480–3, *see supra* note 1, provides that HRS ch. 480 "shall be construed in accordance with judicial interpretations of similar federal antitrust statutes,"

and HRS § 480–2(b) provides that "[i]n construing this section, the courts . . . shall give due consideration to the . . . decisions of . . . the federal courts interpreting . . . 15 U.S.C. [§ ] 45(a)(1)[ (2000) ]," [5] in recognition of the fact that HRS § 480–2 is "a virtual counterpart." [6] *Keka,* 94 Hawai'i at 228, 11 P.3d at 16. The Federal Trade Commission (FTC), in *In re Cliffdale Assocs., Inc.,* 1984 WL 565319, 103 F.T.C. 110 (1984), developed a three-part analytical test for "deception," [7] which the federal courts have thereafter extensively adopted, *see FTC v. Verity Int'l, Ltd.,* 443 F.3d 48, 63 (2d. Cir.2006); *FTC v. Tashman,* 318 F.3d 1273, 1277 (11th Cir. 2003); *FTC v. Pantron I Corp.,* 33 F.3d 1088, 1095 (9th Cir.1994); *FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1029 (7th Cir.1988). Under the *Cliffdale Assocs.* test, a deceptive act or practice is "(1) a representation, omission, or practice[ ] that (2) is likely to mislead consumers acting reasonably under the circumstances [where] (3) [ ] the representation, omission, or practice is material." *Verity Int'l,* 443 F.3d at 63. A representation, omission, or practice is considered "material" if it involves " 'information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.' " *Novartis Corp. v.*

*FTC,* 223 F.3d 783, 786 (D.C.Cir.2000) (quoting *Cliffdale Assocs.,* 103 F.T.C. at 165); *see also Kraft, Inc. v. FTC,* 970 F.2d 311, 322 (7th Cir.1992); *FTC v. Crescent Publ'g Group, Inc.,* 129 F.Supp.2d 311, 321 (S.D.N.Y.2001); *FTC v. Five-Star Auto Club, Inc.,* 97 F.Supp.2d 502, 529 (S.D.N.Y. 2000); *FTC v. Sabal,* 32 F.Supp.2d 1004, 1007 (N.D.Ill.1998). Moreover, the *Cliffdale Assocs.* test is an objective one, turning on whether the act or omission "is likely to mislead consumers," *Verity Int'l,* 443 F.3d at 63, as to information "important to consumers," *Novartis Corp.,* 223 F.3d at 786, in making a decision regarding the product or service.[8]

Given our obligation under HRS §§ 480–3 and 480–2(b) to apply federal authority as a guide in interpreting HRS ch. 480, we hereby adopt the three-prong *Cliffdale Assocs.* test in determining when a trade practice is deceptive.[9]

2. *Under The Cliffdale Assocs. Objective Consumer Test, The Determination Of A Deceptive Omission Is One For The Trier Of Fact, Thereby Rendering Summary Judgment Inappropriate.*

The Courbats do not allege that the waiver itself is deceptive; rather, they urge

---

**5.** 15 U.S.C. § 45(a)(1) provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."

**6.** Hawai'i courts have long recognized, therefore, that federal interpretations of 15 U.S.C. § 45(a)(1) guide us in construing HRS § 480–2 "in light of conditions in Hawai'i." *Ai v. Frank Huff Agency,* 61 Haw. 607, 613 n. 11, 607 P.2d 1304, 1309 n. 11 (1980); *see also Island Tobacco Co. v. R.J. Reynolds Tobacco Co.,* 63 Haw. 289, 299, 627 P.2d 260, 268 (1981) *overruled on other grounds by Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transp. Co., Inc.,* 91 Hawai'i 224, 982 P.2d 853 (1999); *Rosa v. Johnston,* 3 Haw. App. 420, 426, 651 P.2d 1228, 1233–34 (1982).

**7.** *See Cliffdale Assocs.,* 103 F.T.C. at 164–65 (characterizing the new standard as a refinement of the "tendency or capacity to deceive" test used by the FTC to that point and pronouncing the old test "circular and therefore inadequate to provide guidance").

**8.** While federal courts have not expressly categorized the test as objective, the FTC, in *Cliffdale*

*Assocs.,* commented that "[t]he requirement that an act or practice be considered from the perspective of a consumer acting reasonably in the circumstances is not new. . . . [The FTC] has long recognized that the law should not be applied in such a way as to find that honest representations are deceptive simply because they are misunderstood by a few. . . . [A]n advertisement would not be considered deceptive merely because it could be unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons [to] whom the representation is addressed." 103 F.T.C. at 165 (footnotes and internal quotation signals omitted).

**9.** Other states have already adopted the *Cliffdale Assocs.* test. *See, e.g., Luskin's, Inc. v. Consumer Prot. Div.,* 353 Md. 335, 726 A.2d 702, 713 (1999); *Carter v. Gugliuzzi,* 168 Vt. 48, 716 A.2d 17, 23 (1998). Our adoption of the *Cliffdale Assocs.* test does not change the existing rule that, in order to establish a violation of HRS § 480–2, the plaintiff need not establish an intent to deceive on the part of the defendant, *World Travel Vacation Brokers,* 861 F.2d at 1029; *Five-Star Auto Club,* 97 F.Supp.2d at 526, nor any actual deceit, *United States Steel Corp.,* 82 Hawai'i at 51, 919 P.2d at 313.

that the deceptive practice at issue was the booking agent's failure to inform them of the waiver requirement during the negotiation and execution of the underlying contract.[10] Nevertheless, if any deceptive omission occurred with respect to the negotiation and execution of the original contract, the operation of HRS § 480–12, *see supra* note 1, would render both the original contract and the waiver, signed afterward, void.[11] Thus, the waiver's survival depends on the trier of fact's determination as to whether the omission of the waiver requirement during Island Incentives, Inc.'s booking process was deceptive and therefore in violation of HRS § 480–2.

The application of an objective "reasonable person" standard, of which the *Cliffdale Assocs.* test is an example, is ordinarily for the trier of fact, rendering summary judgment "often inappropriate." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 107, 839 P.2d 10, 24 (1992), *cited in Casumpang v. ILWU Local 142*, 108 Hawai'i 411, 425, 121 P.3d 391, 405 (2005); *Arquero v. Hilton Hawaiian Village LLC*, 104 Hawai'i 423, 433, 91 P.3d 505, 515 (2004). "Inasmuch as the term 'reasonableness' is subject to differing interpretations ..., it is inherently ambiguous. Where ambiguity exists, summary judgment is usually inappropriate because 'the determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable [minds] might differ.'" *Amfac, Inc.*, 74 Haw. at 107, 839 P.2d at 24 (quoting *Bishop Trust Co. v. Cent. Union Church*, 3 Haw.App. 624, 628–29, 656 P.2d 1353, 1356 (1983)). Reasonableness can only constitute a question of law

suitable for summary judgment " 'when the facts are undisputed and not fairly susceptible of divergent inferences' because '[w]here, upon all the evidence, but one inference may reasonably be drawn, there is no issue for the jury.'" *Id.* at 108, 839 P.2d at 24 (quoting *Broad & Branford Place Corp. v. J.J. Hockenjos Co.*, 132 N.J.L. 229, 39 A.2d 80, 82 (1944) (brackets in original)). " '[A] question of interpretation is not left to the trier of fact where evidence is so clear that no reasonable person would determine the issue in any way but one.'" *Id.* (quoting *Restatement (Second) of Contracts* § 212 cmt. e (1981) (brackets in original)). *See also Restatement (Second) of Contracts* § 212(2) (1981 and Supp. 2005) ("A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or *on a choice among reasonable inferences to be drawn from extrinsic evidence.*") (Emphasis added). There is no genuine issue of material fact regarding the failure to disclose the waiver requirement during negotiation of the original tour contract, but we cannot say that, applying the *Cliffdale Assocs.* test, reasonable minds could draw only one inference as to the materiality of that omission to reasonable consumers contemplating the transaction. Therefore, the question whether a waiver requirement would be materially important in booking a horseback tour remains one for the trier of fact.

Because a genuine issue of material fact, resolvable only by the trier of fact, remains in dispute, the grant of summary judgment on the HRS ch. 480 claim was erroneous. We therefore vacate the circuit court's May

---

**10.** It is undisputed that Island Incentives, Inc. was acting as the Ranch's agent in this matter, and "we note that an owner is responsible for the representations of his agent made within the scope of his agent's selling authority." *Au v. Au*, 63 Haw. 210, 215, 626 P.2d 173, 178 (1981) (citing *Negyessy v. Strong*, 136 Vt. 193, 388 A.2d 383, 385 (1978)).

**11.** If the waiver were severable from the underlying contract, it could survive despite a determination that the original contract was void. *See Ai v. Frank Huff Agency*, 61 Haw. 607, 619, 607 P.2d 1304, 1312 (1980) ("The wording on HRS § 480–12 might ... appear to suggest that any contract containing an illegal provision ...

should be held unenforceable in its entirety.... [U]nder ordinary contract law, however, ... a partially legal contract may be upheld if the illegal portion is severable from the part which is legal."). However, "the general rule is that severance of an illegal provision is warranted and the lawful portion ... enforceable when the illegal provision is not central to the parties' agreement." *Beneficial Hawaii, Inc. v. Kida*, 96 Hawai'i 289, 311, 30 P.3d 895, 917 (2001). The underlying contract at issue *is* the sum of the parties' agreement; the waiver would be considered an addendum to it. Therefore, the waiver is not severable and must stand or fall with the underlying contract.

13, 2002 judgment and remand for further proceedings consistent with this opinion.

B. *The Consequences, On Remand, Of The Determination By The Trier Of Fact As To Whether Nondisclosure Of The Waiver Requirement Was An unfair Or Deceptive Trade Practice*

If, on remand, the trier of fact determines that the nondisclosure of the waiver was a deceptive trade practice, rendering the waiver void, then the Courbats' negligence claims proceed free of the waiver defense. Nevertheless, for the reasons set forth below and for purposes of any subsequent trial on the Courbats' negligence claims, we hold that HRS ch. 663B, entitled "Equine activities," *see supra* note 2, setting forth a rebuttable presumption of non-negligence on the part of the tour operator, does not apply to the present matter.

Conversely, if, on remand, the trier of fact determines that the nondisclosure of the waiver was *not* deceptive, then the Courbats validly waived their negligence claims.

1. *The Statutory Presumption Of Non–Negligence For Equine–Related Injuries Set Forth In HRS Ch. 663B Does Not Apply To The Courbats' Claims.*

■ If the trier of fact determines that the failure to inform the Courbats of the waiver requirement was a deceptive trade practice, then the negligence waiver, along with the underlying contract, will be rendered void, and the Courbats' negligence claims will be revived. In order to provide guidance on remand, therefore, we hold that it was error for the circuit court in the present matter to apply HRS § 663B–2(a), *see supra* note 2, which establishes a rebuttable presumption in favor of horseback tour operators that any injury "caused solely by the inherent risk and unpredictable nature of the equine" is not due to the negligence of the tour operator.

HRS § 663B–2(b) provides in relevant part that "[n]othing in this section shall prevent or limit the liability of an equine activity sponsor ... if the equine activity sponsor, equine professional, or person: ... (2) [p]rovided the equine and ... failed to reasonably supervise the equine activities and such failure is a proximate cause of the injury." The substance of Lisa's claim revolves around her assertion that Nakoa failed to monitor her approach toward his horse while he was engaged in conversation with another guest; in other words, Lisa claims that Nakoa "failed to reasonably supervise the equine activities" that were the "proximate cause of [her] injury." Therefore, we hold that, if Lisa is correct, the presumption of non-negligence set forth in HRS § 663B–2(a) would not apply to the Courbats' claims.

2. *If The Trier Of Fact Determines That The Nondisclosure Of The Waiver Was Not An Unfair Or Deceptive Trade Practice, Then The Courbats Validly Waived Their Negligence Claims.*

a. *The waiver was validly executed.*

■ Citing *Krohnert v. Yacht Sys. of Hawaii*, 4 Haw.App. 190, 201, 664 P.2d 738, 745 (1983), the Courbats assert that, because they manifested no clear and unequivocal acceptance of the terms of the waiver, the waiver cannot be enforced against them. However, pursuant to the following analysis, we hold that, if the trier of fact finds that the failure to inform the Courbats of the waiver requirement was not a deceptive trade practice, then the waiver, in all other respects, was valid.

■ "The general rule of contract law is that one who assents to a contract is bound by it and cannot complain that he has not read it or did not know what it contained." *Leong v. Kaiser Found. Hosps.*, 71 Haw. 240, 245, 788 P.2d 164, 168 (1990); *see also Joaquin v. Joaquin*, 5 Haw.App. 435, 443, 698 P.2d 298, 304 (1985); *In re Chung*, 43 B.R. 368, 369 (Bankr.D.Haw.1984); *In re Kealoha*, 2 B.R. 201, 209 (Bankr.D.Haw.1980). Furthermore, " '[p]arties are permitted to make exculpatory contracts so long as they are knowingly and willingly made and free from fraud. No public policy exists to prevent such contracts.' " *Fujimoto v. Au*, 95 Hawai'i 116, 156, 19 P.3d 699, 739 (2001) (some brackets omitted) (quoting *Gen. Bargain Ctr. v. Am. Alarm Co., Inc.*, 430 N.E.2d 407, 411–

12 (Ind.Ct.App.1982)). "[S]uch bargains are not favored, however, and, if possible, bargains are construed not to confer this immunity." *Fujimoto*, 95 Hawai'i at 155, 19 P.3d at 738. Therefore, as a general rule, " '[e]xculpatory clauses will be held void if the agreement is (1) violative of a statute, (2) contrary to a substantial public interest, or (3) gained through inequality of bargaining power.' " 95 Hawai'i at 156, 19 P.3d at 739 (quoting *Andrews v. Fitzgerald*, 823 F.Supp. 356, 378 (M.D.N.C.1993)).

The Courbats have not alleged that any of the terms of the waiver, or the use of a waiver by the Ranch, violates a statute; on the contrary, the Courbats concede that waivers are an acceptable method by which tour operators may seek to limit their liability in response to rising insurance and litigation costs.

■ In *Krohnert*, the ICA defined the public interest

as involving some or all of the following characteristics:

■ It concerns a business of a type generally thought suitable for public regulation.

■ The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.

■ The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.

■ As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.

■ In exercising a superior bargaining power the party confronts the public

with a standardized adhesion contract of exculpation and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.

■ Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller of the service, subject to the risk of carelessness by the seller or his agents.

4 Haw.App. at 199, 664 P.2d at 744 (finding under this test that the exculpatory clause contained in a contract for marine surveying was permissible) (brackets omitted) (quoting *Lynch v. Santa Fe Nat'l Bank*, 97 N.M. 554, 627 P.2d 1247, 1251–52 (N.M.Ct.App.1981) (holding that services of escrow agents in New Mexico were not in the nature of a public service so as to render an exculpatory clause unenforceable) (quoting *Tunkl v. Regents of Univ. of Cal.*, 60 Cal.2d 92, 32 Cal. Rptr. 33, 383 P.2d 441, 445–46 (1963) (declaring invalid as against the public interest an exculpatory clause for future negligence required for admission to a public research hospital))); *see also* 15 *Corbin on Contracts* § 85.18 (2003 & Supp.2005) (summarizing a similar test commonly used by courts and noting that courts tend to enforce exculpatory clauses for recreational activities under the test).[12] Entities that have been found to fall under the public interest doctrine, rendering exculpatory clauses void, include common carriers, *see Adams Express Co. v. Croninger*, 226 U.S. 491, 509, 33 S.Ct. 148, 57 L.Ed. 314 (1913); *Shippers Nat'l Freight Claim Council, Inc. v. Interstate Commerce Comm'n*, 712 F.2d 740, 746 (2d Cir.1983); *Clairol, Inc. v. Moore–McCormack Lines, Inc.*, 79 A.D.2d 297, 309–10, 436 N.Y.S.2d 279 (N.Y.App.Div.1981), and hospitals, *see Tunkl*, 32 Cal.Rptr. 33, 383 P.2d at 447; *Smith v. Hosp. Auth. of Walker, Dade & Catoosa Counties*, 160 Ga.App. 387, 287 S.E.2d 99,

---

**12.** Courts have upheld exculpatory clauses relating to car racing, *see Cadek v. Great Lakes Dragaway, Inc.*, 843 F.Supp. 420 (N.D.Ill.1994); *Barbazza v. Int'l Motor Sports Ass'n*, 245 Ga.App. 790, 538 S.E.2d 859 (2000), snow skiing, *see Chauvlier v. Booth Creek Ski Holdings, Inc.*, 109 Wash.App. 334, 35 P.3d 383 (2001), skydiving,

*see Scrivener v. Sky's The Limit, Inc.*, 68 F.Supp.2d 277 (S.D.N.Y.1999), and horseback riding, *see Street v. Darwin Ranch, Inc.*, 75 F.Supp.2d 1296, 1299 (D.Wyo.1999) (finding that "recreational trail rides are neither of great importance to the public, nor a practical necessity to any member of the public").

101 (1981); *Belshaw v. Feinstein*, 258 Cal. App.2d 711, 65 Cal.Rptr. 788, 798 (1968).

Applying these factors to the present matter, we determine that the public interest here is not at stake: recreational activity tours are not generally suitable to public regulation, in the manner of common carriers, nor of great importance to the public, nor of an essential nature, in the manner of medical care, such that the provider's bargaining power is greatly enhanced over any member of the public seeking their services.

 Finally, as the United States District Court for the District of Hawai'i noted, in considering negligence waivers in the context of recreational activity, while such waivers may be contracts of adhesion, in that they are presented on a "take-it-or-leave-it" basis, they are not unconscionable, but "are of a sort commonly used in recreational settings" and "are generally held to be valid." *Wheelock v. Sport Kites, Inc.*, 839 F.Supp. 730, 736 (D.Haw.1993). "[C]ontracts [of adhesion] are 'unenforceable if two conditions are present: (1) the contract is the result of coercive bargaining between parties of unequal bargaining strength; and (2) the contract unfairly limits the obligations and liabilities of, or otherwise unfairly advantages, the stronger party.'" *Fujimoto*, 95 Hawai'i at 156, 19 P.3d at 739 (quoting *Brown v. KFC Nat'l Mgmt. Co.*, 82 Hawai'i 226, 247, 921 P.2d 146, 167 (1996)); *see also Wheelock*, 839 F.Supp. at 735 ("[A]dhesion contracts are fully enforceable provided that they are not unconscionable and do not fall outside the reasonable expectations of the weaker or adhering party."). Unequal bargaining strength "involves the absence of alternatives; specifically whether the plaintiffs were 'free to use or not to use' [the] defendant's ... services." *Krohnert*, 4 Haw.App. at 199, 664 P.2d at 744 (quoting *Lynch*, 627 P.2d at 1250). These conditions are generally not germane in the recreational waiver context. In the context of a recreational sport or adventure activity, freely undertaken for pleasure, "coercive bargaining" and "an absence of alternatives" are terms that hold little meaning.

In the present matter, Lisa read through and responded to queries contained in the waiver form and had no further questions or concerns regarding the contents before she signed it. Steven conceded that he routinely relied on his wife to review documents before signing them and that he knew he was waiving rights when he signed the form. The record demonstrates that the Courbats were given adequate time and opportunity to fully review the waiver presented to them before they signed it and that both knew that by signing it they were waiving legal rights in return for being allowed to participate in the ride. In short, there is no evidence of coercion. By signing the waiver form, they demonstrated that they agreed to its terms, and by reading it, or, in Steven's case, in relying on the advice of his wife, demonstrated knowledge of its contents. Moreover, they had signed similar waivers that week for another activity and were familiar with what they represented. Accordingly, we hold that, if the trier of fact determines that the nondisclosure of the waiver was not an unfair or deceptive trade practice, the Courbats' waiver was valid.

b. *The scope of the Courbats' waiver does not extend beyond negligence claims.*

 The language of the waiver, *see supra* note 3, releases the Ranch and its agents and holds it harmless "from loss or damage to property or injury to [the undersigned] ... resulting from [the undersigned] ... being a spectator or participant or while engaged in any such activity in the event[-]related facilities." However, because " '[e]xculpatory provisions are not favored by the law and are strictly construed against parties relying on them,' " the effect of the broad exculpatory language contained in the Ranch's waiver should be construed to limit the waiver's scope to simple negligence claims; it does not protect the Ranch against its own gross negligence or willful misconduct. *Fujimoto*, 95 Hawai'i at 156, 19 P.3d at 739 (quoting *Andrews*, 823 F.Supp. at 378); *see also Wheelock*, 839 F.Supp. at 736 (interpreting the reasoning in *Krohnert* to conclude that to allow an exculpatory clause to extend to gross negligence would violate

the public interest, rendering the clause void).

## IV. CONCLUSION

In light of the foregoing analysis, we vacate the circuit court's May 13, 2002 judgment in favor of the Ranch and against the Courbats and remand for further proceedings consistent with this opinion.

Dissenting Opinion by DUFFY, J., in which ACOBA, J., joins.

I respectfully dissent. In my view, no reasonable person would find that the recreational tour operator's failure to disclose the waiver requirement of Dahana Ranch, Inc. during negotiation of the horseback riding activity was a deceptive trade practice under HRS § 480–2. The Courbats concede that waivers are an acceptable method by which recreational tour operators and sponsors may seek to limit their liability in response to rising insurance and litigation costs, and admit that they were required to sign such a waiver before participating in a snorkeling activity earlier during the same Hawai'i vacation. Applying the *Cliffdale Assoc.* test to the undisputed facts in this case involving the inherently dangerous activity of horseback riding, I respectfully submit that the tour operator's failure to disclose the waiver requirement of Dahana Ranch, Inc. during negotiation of the horseback riding activity with the Courbats was not a material omission implicating a deceptive trade practice under HRS § 480–2. I would thus affirm the circuit court's grant of summary judgment in favor of Dahana Ranch, Inc.