**\*\*\* NOT FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

**Electronically Filed
Supreme Court
SCWC-15-0000684
10-DEC-2021
09:03 AM
Dkt. 30 SO**

SCWC-15-0000684

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

———————————————————————————————————

JOY P. LEONG AND STEPHEN B. LINDSEY III,
Petitioners/Plaintiffs-Appellants/Cross-Appellees,

vs.

HONOLULU FORD INC.,
Respondent/Defendant-Appellee/Cross-Appellant.

———————————————————————————————————

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-15-0000684; CIV. NO. 1RC14-1-7680)

SUMMARY DISPOSITION ORDER
(By: Recktenwald, C.J., Nakayama, McKenna, and Wilson, JJ., and
Circuit Judge Kuriyama, in place of Pollack, J., recused)

## I.  INTRODUCTION

This case arises from a dispute over the sale of a used 2009 Shelby Cobra GT500KR, a limited edition of an exotic Ford Mustang sports car ("Vehicle"), by Respondent/Defendant-Appellee/Cross-Appellant Honolulu Ford, Inc.[1] ("HFI").  Following

---

[1]    HFI asserts in its response to Buyers' application for writ of certiorari that "the Defendant/Appellee/Cross-Appellant in this case is a dissolved entity and no longer a going concern" and therefore "it is unclear what relief, if any, could be afforded by further review."  Despite HFI's contention that this case is "no longer a going concern[,]" Buyers are

(continued . . .)

negotiations and the execution of two purchase agreements, Petitioners/Plaintiffs-Appellants/Cross-Appellees Joy P. Leong and Stephen B. Lindsey III ("Buyers") took possession of the Vehicle.  Although Buyers had raised concerns about the Vehicle's clutch during the test drives, it was not until Buyers had the opportunity to drive the Vehicle home that they concluded some aspect of the clutch assembly was defective. Buyers returned the Vehicle to HFI after driving it for forty-seven miles and asked HFI to repair the clutch free of charge. HFI refused to repair the Vehicle at no cost to Buyers and, following rescission of the purchase agreement, refused to return Buyers' $1,000.00 deposit because HFI claimed Buyers caused the Vehicle to have a "burnt clutch."

---

(...continued)

entitled to proceed in their action against HFI and may recover any award from HFI's designated trustees.  Makaneole v. Pacific Ins. Co., 77 Hawai'i 417, 420-21, 886 P.2d 754, 757-58 (1994).

Statutes permitting suit against "dissolved" corporations ("survival statutes") generally permit individuals or entities to recover from dissolved corporations.  36 A.L.R. 7th Art. 4 (2018).  Hawai'i's survival statute is no exception.  Hawai'i Revised Statutes ("HRS") § 634-61 (1972) provides:

> The death of a plaintiff or defendant or the dissolution of a corporate plaintiff or defendant shall not cause an action to abate, but it may be continued upon substitution of the proper parties as provided by the rules of court, or if the claim is one which survives to or against the surviving parties the action shall proceed in favor of or against the surviving parties as provided by the rules of court.

HRS § 634-61.

2

Buyers asserted numerous claims alleging that HFI had engaged in unfair or deceptive acts or practices ("UDAP") when it sold Buyers the Vehicle.  Buyers seek review of the Intermediate Court of Appeals' ("ICA") affirmance of the District Court of the First Circuit's ("district court") Order Granting Defendant HFI's Motion for Summary Judgment[2] entered on March 24, 2015 ("Summary Judgment Order") and the Judgment[3] entered on August 25, 2015 against Buyers on all remaining claims.

Among other claims, Buyers argue that HFI was statutorily required to provide a warranty for the clutch assembly in the Vehicle, but refused to do so, and instead, misrepresented the nature of the damage that was found on the Vehicle.  Following the rescission of the sales agreement, Buyers allege that HFI improperly retained Buyers' $1,000.00 deposit by claiming that Buyers destroyed the Vehicle's clutch assembly by driving the Vehicle for forty-seven miles.

On certiorari, Buyers raise three main issues: (1) whether the ICA was correct in ruling that summary judgment was appropriately granted against Buyers' claim that HFI

---

[2]     The Honorable Michael K. Tanigawa presided over the summary judgment hearing and entered the Summary Judgment Order.

[3]     The Honorable Gerald H. Kibe presided over the trial and entered the Judgment.

violated HRS § 480-2 (2002), which prohibits unfair or deceptive trade practices, by increasing the contract price by $1,800.47 above the price that had been negotiated; (2) whether the ICA was correct in finding that HFI was entitled to retain the $1,000.00 deposit to offset its costs in repairing the clutch; and (3) whether HFI was statutorily required to repair the Vehicle at no cost to Buyers.

The district court erroneously interpreted HRS § 481J-2 (2008)[4] to conclude that the warranty for used motor vehicles in HRS § 481J-2 does not cover a clutch assembly.  The

---

[4]    HRS § 481J-2 (2008) provides in relevant part:

Used motor vehicles:  written warranty required, terms. (a) No used motor vehicle shall be sold in this State by a dealer to a consumer unless accompanied by a written warranty covering the full cost of both parts and labor necessary to repair any defect or malfunction in a part covered under subsection (c) that impairs the used motor vehicle's safety or use.  Defects and malfunctions that affect only appearance shall not be deemed to impair safety or use for the purposes of this chapter.

. . . .

(c) The written warranty shall require the dealer or its agent to repair or, at the election of the dealer, reimburse the consumer for the reasonable costs of repairing the failure of a covered part.  Covered parts shall at least include the following items:

(1) Engine, including all lubricated parts, water pump, fuel pump, manifolds, engine block, cylinder head, rotary engine housings, flywheel, gaskets, and seals;

(2) Transmission, including the transmission case, internal parts, torque converter, gaskets, and seals, except four-wheel drive vehicles shall be excluded from coverage as provided for in this paragraph;

(continued . . .)

4

district court also erred when it found that Buyers failed to carry their burden of proving that the clutch assembly was damaged or otherwise defective when they took possession of the Vehicle. These errors are due to a distinction between the language that HFI used to describe the damage/defect that it found on the Vehicle (a "burnt clutch") and the actual repairs that HFI eventually made to the Vehicle (replacement of the entire "clutch assembly" including the pressure pad, slave cylinder, and flywheel). HFI was statutorily required to repair the clutch assembly in the Vehicle without charge and, thus, was not entitled to retain Buyers' $1,000.00 deposit.

---

(...continued)

> (3) Drive axle, including front and rear drive axle housings and internal parts, axle shafts, propeller shafts, and universal joints, except four-wheel drive vehicles shall be excluded from coverage as provided in this paragraph;
>
> (4) Brakes, including master cylinder, vacuum assist booster, wheel cylinders, hydraulic lines and fittings, and disc brake calipers;
>
> (5) Radiator;
>
> (6) Steering, including the steering gear housing and all internal parts, power steering pump, valve body, piston, and rack; and
>
> (7) Alternator, generator, starter, and ignition system, excluding the battery.

## II.  STANDARDS OF REVIEW

### A.  Summary Judgment

We review the district court's orders of summary judgment under the same standard applied by the district court. Makaneole, 77 Hawai'i at 420, 886 P.2d at 757.  "Summary judgment is appropriate where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to judgment as a matter of law."  Reed v. City & Cty. of Honolulu, 76 Hawai'i 219, 225, 873 P.2d 98, 104 (1994).

### B.  Statutory Interpretation

The district court's interpretation of a statute is reviewed de novo.  State v. Pacheco, 96 Hawai'i 83, 94, 26 P.3d 572, 583 (2001).

## III.  DISCUSSION

### A.  The ICA Did Not Err in Finding that There Was No Unfair or Deceptive Act or Practice Where Buyers Voluntarily Signed Contracts Agreeing to a Base Price of $41,800.47 for the Vehicle

In order to obtain relief under HRS § 480-2,[5] a consumer must establish:  "(1) a violation of HRS § 480-2;

---

[5]     HRS § 480-2 provides:

Unfair competition, practices, declared unlawful

(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

(continued . . .)

6

(2) injury to the consumer caused by such a violation; and

(3) proof of the amount of damages." Davis v. Wholesale Motors, Inc., 86 Hawai'i 405, 417, 949 P.2d 1026, 1038 (App. 1997). A trade practice violates HRS § 480-2 when "it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." Balthazar v. Verizon Hawaii, Inc., 109 Hawai'i 69, 77, 123 P.3d 194, 202 (2005) (internal quotation marks omitted) (quoting Hawai'i Cmty. Fed. Credit Union v. Keka, 94 Hawai'i 213, 228, 11 P.3d 1, 16 (2000)). This court has held that "a deceptive act or practice is (1) a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances where (3) the representation,

_____

(...continued)

 (b) In construing this section, the courts and the office of consumer protection shall give due consideration to the rules, regulations, and decisions of the Federal Trade Commission and the federal courts interpreting section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

 (c) No showing that the proceeding or suit would be in the public interest (as these terms are interpreted under section 5(b) of the Federal Trade Commission Act) is necessary in any action brought under this section.

 (d) No person other than a consumer, the attorney general or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section.

 (e) Any person may bring an action based on unfair methods of competition declared unlawful by this section.

7

omission, or practice is material." Courbat v. Dahana Ranch, Inc., 111 Hawai'i 254, 262, 141 P.3d 427, 435 (2006) (cleaned up) (quoting F.T.C. v. Verity Int'l, Ltd., 443 F.3d 48, 63 (2d Cir. 2006)).

Here, Buyers argue that HFI violated HRS § 480-2 by increasing the base price of the Vehicle from a negotiated price of $40,000.00 to $41,800.47 in the first and second purchase contracts without bringing the change in price to Buyers' attention. In granting summary judgment on this issue in favor of HFI, the district court found that there was no question of material fact that the alleged behavior did not constitute a deceptive act or practice. The ICA affirmed the grant of summary judgment on the grounds that Buyers had voluntarily signed two purchase agreements that readily identified the base price of the Vehicle as $41,800.47.

In HFI's pre-trial Request for Admissions, completed by Buyer Lindsey, Buyers "[a]dmit" that "[Buyers] agreed to purchase the Vehicle for $49,262.83, including fees."[6] This

---

[6] The base price of the vehicle excluded fees and additional costs. $41,800.47 was the base price used to calculate the total price of $49,262.83 for the vehicle purchase. Buyers allege that:

> [they are] not saying that they did not agree to buy the car for a certain price, nor, for that matter, that they did not actually buy it at that price. They were saying that their agreement to buy at $49,262.83 (originally $46,917.28) and their actual purchase at that price were obtained by fraud, in that they were tricked

(continued . . .)

8

admission, coupled with the fact that Buyers signed two purchase contracts agreeing to the base price of $41,800.47, demonstrates that Buyers were aware that they were purchasing the Vehicle for the price that appeared in the contract. See Leong v. Kaiser Found. Hosps., 71 Haw. 240, 245, 788 P.2d 164, 168 (1990) (explaining that the "general rule of contract law is that one who assents to a contract is bound by it and cannot complain that he has not read it or did not know what it contained"). Moreover, the purchase contracts signed by Buyers contained merger clauses, stating that the contracts were complete and final representations of the terms of the contracts. Because Buyers were, or should have been, aware that they were agreeing to purchase the Vehicle for a base price of $41,800.47, the alleged increase in price from the negotiated price of $40,000.00 does not amount to a violation of HRS § 480-2 because the act or practice was "[un]likely to mislead consumers acting reasonably under the circumstances[.]" See Courbat, 111 Hawai'i at 262, 141 P.3d at 435. Accordingly, the district court did

---

(...continued)

> into signing the agreement to buy at that price through the process of (1) Defendant's salespeople and Plaintiffs having successfully negotiated the price to be $40,000 for the car itself, followed by (2) Defendant's substituting $41,800.47 as the "Base Price of Vehicle." Defendant used the larger figure in calculating the "Total Price" on the "AUTOMOBILE PURCHASE AGREEMENT." Defendant had a duty to disclose the change but remained silent.

not err in granting summary judgment in favor of HFI as to the question of whether HFI committed a UDAP violation related to the sales price of the Vehicle.

**B.   The Statutory Warranty Under HRS § 481J-2 Covers the Components of the Clutch Assembly and Required HFI to Repair Such Damage at No Cost to Buyers**

HRS § 481J-2 governs used motor vehicle sales and warranties.  It requires the dealer to provide a written warranty covering "the full cost of both parts and labor necessary to repair any defect or malfunction in a part covered under subsection (c) that impairs the used motor vehicle's safety or use."  HRS § 481J-2(c) includes an enumerated list of covered items:

> (c) . . .  Covered parts shall <u>at least</u> include the following items:
>
> (1) Engine, including all lubricated parts, water pump, fuel pump, manifolds, engine block, cylinder head, rotary engine housings, flywheel, gaskets, and seals;
>
> (2) Transmission, including the transmission case, internal parts, torque converter, gaskets, and seals, except four-wheel drive vehicles shall be excluded from coverage as provided for in this paragraph;
>
> (3) Drive axle, including front and rear drive axle housings and internal parts, axle shafts, propeller shafts, and universal joints, except four-wheel drive vehicles shall be excluded from coverage as provided in this paragraph;
>
> (4) Brakes, including master cylinder, vacuum assist booster, wheel cylinders, hydraulic lines and fittings, and disc brake calipers;
>
> (5) Radiator;
>
> (6) Steering, including the steering gear housing and all internal parts, power steering pump, valve body, piston, and rack; and

(7) Alternator, generator, starter, and ignition system, excluding the battery.

HRS § 481J-2(c) (emphasis added). The question of whether the clutch assembly is covered under HRS § 481J-2(c) is fundamental to the determination of Buyers' claims. Though the ICA did not discuss whether the clutch assembly is covered under HRS § 481J-2(c), the district court held in Finding of Fact ("FOF") Number ("No.") 29 that "[m]anual clutch mechanisms are not included in express warranties for used car sales under HRS § 481J-2." To determine whether HRS § 481J-2(c) covered the clutch assembly, the district court consulted the Merriam-Webster Dictionary as to the definition of the word "clutch." Using the Merriam-Webster definition, the district court determined in FOF No. 30 that "[t]he Merriam-Webster Dictionary denotes that a clutch mechanism is situated <u>between</u> the engine and the transmission of a motor vehicle"[7] and explained that "the clutch is what's between the engine and what some people call the gear box, i.e. transmission. So I'm satisfied that, in common terminology, it was not intended that clutch mechanisms be included within the express warranty for used car sales." In FOF No. 32, the

---

[7]      The district court noted at trial that the Merriam-Webster Dictionary explained that "if you were in the British Isles, clutch would be included in the drive shaft, the entire mechanism, but if you are in the U.S. of A, the clutch is what's between the engine and what some people call the gear box, i.e. transmission." Indeed, even by the dictionary definition relied upon by the district court, the "drive shaft" is specifically enumerated as a covered part in HRS § 481J-2(c).

11

district court found that "[e]ven if the clutch was covered by the warranty covering the Vehicle, HFI was not required to undertake warranty repairs on the clutch in the event of abuse or neglect" and "obviously it's [Buyers'] burden to establish by a preponderance that . . . [the clutch] wasn't that way [(i.e., burned out)] before."[8]  Accordingly, the district court concluded that "as to the warranty issue, there is no unfair or deceptive act or practice" because even if the clutch assembly was covered under HRS § 481J-2(c), HRS § 481J-2(c)'s warranty would not apply because Buyers failed to prove that they did not engage in abuse or neglect that damaged the clutch.  As discussed below, FOF Nos. 29, 30, and 32 are clearly erroneous.

Statutory interpretation is a question of law that is reviewed de novo.  Courbat, 111 Hawai'i at 260, 141 P.3d at 433. When construing a statute, "our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself."  Id. (quoting Gray v. Admin. Dir. of the Court, 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997)).  HRS § 481J-2(c) is unambiguous as to whether it covers the components of the clutch assembly--the "flywheel" and the

---

[8]     As discussed infra, it was error for the district court to place this burden on Buyers, as HFI's claim that it was entitled to retain the $1,000.00 deposit to offset the cost of the repairs was in the nature of an affirmative defense, the burden of which was on HFI.

12

"gaskets" and "seals" that failed in the slave cylinder--that HFI replaced. Accordingly, the district court's reliance on the Merriam-Webster Dictionary, and its FOF No. 30, was error.

HRS § 481J-2 requires the dealer, here, HFI, to provide a written warranty covering "the full cost of both parts and labor necessary to repair any defect or malfunction in a part covered under subsection (c) that impairs the used motor vehicle's safety or use." The plain language of HRS § 481J-2(c) explicitly lists "covered parts" that include components of the manual clutch assembly that were replaced by HFI. It is undisputed that HFI replaced at least the clutch pressure pad, the slave cylinder (due to a failed rubber gasket), and the flywheel in the Vehicle. Explicitly listed among the covered parts in HRS § 481J-2(c) are the flywheel, gaskets, seals, all lubricated parts, internal parts, and torque converter.[9]

HFI was explicitly required to cover the components on the clutch assembly--"gaskets" and "seals" that failed in the slave cylinder and the "flywheel"--that it replaced in the Vehicle. HFI mechanic and expert witness Henry Tabios ("Tabios") testified that a "slave leak" occurs in "the hydraulic part of the clutch" and Buyers' expert witness Kenneth Moniz ("Moniz") testified that such a leak would be caused by a

---

[9]     An HFI expert witness stated in an interrogatory that a clutch is part of a transmission; however, he changed his testimony at trial.

13

leak in the "rubber seal, and most leaks [are] from wear and tear." HRS § 481J-2(c) lists "all lubricated parts," "internal parts," and lists "gaskets[] and seals" twice, under both subsections (c)(1) and (c)(2). Thus, the slave cylinder (or, at the very least, the gaskets and seals that failed in the slave cylinder) is covered under the statutory warranty. See HRS § 481J-2(c). HRS § 481J-2(c) explicitly requires a dealer to warrant the "flywheel[.]" Id. It is uncontested that the flywheel was damaged and had to be replaced. Accordingly, the flywheel is covered under the statutory warranty. See id. Although HRS § 481J-2(c) does not explicitly name the "clutch" or "clutch assembly[,]" the statute's reference to the "torque converter" captures the statute's intent to cover the equivalent components in a manual transmission vehicle. Buyers' expert witness, Moniz, testified that "the torque converter" in an automatic vehicle "has the same function as a clutch" in a manual transmission vehicle. Therefore, the entire clutch assembly (including the clutch pressure pad) is covered under the statutory warranty, and the district court's FOF No. 29 was erroneous.[10] See HRS § 481J-2(c).

_____

[10] The interpretation of HRS § 481J-2(c)(2) could also rely on the commonsense understanding of the word "transmission" as itself including the "clutch assembly" in a vehicle with a manual transmission. While the clutch mechanism sits in between the engine and the transmission, a reasonable consumer is likely to read "transmission" as encompassing the clutch, given

(continued . . .)

The district court also erred in holding that Buyers failed to carry "their burden of proving that the clutch [assembly] was damaged or otherwise defective when they took possession of the Vehicle." The placement of this burden on Buyers was an error of law, and the district court's FOF No. 32--that "[e]ven if the clutch was covered by the warranty covering the Vehicle, HFI was not required to undertake warranty repairs" because the Buyers failed "to establish by a preponderance that . . . [the clutch] was burned out, burned, wasn't that way before"--was erroneous.

Here, where HFI retained Buyers' $1,000.00 deposit to offset the costs of the "clutch assembly" replacement, the burden was on HFI to prove that Buyers ruptured a gasket on the slave cylinder and destroyed the clutch assembly in the span of forty-seven miles, not as a result of "normal wear or usage[.]" As discussed below, Buyers established by uncontested expert testimony that a leaky slave cylinder cannot be caused by use or

_____

(...continued)

the clutch mechanism's essentiality in engaging and disengaging the transmission from the drive shaft's moving parts. Moreover, unlike HRS § 481J-2(c), other state statutes explicitly exclude parts of a vehicle that wear out with ordinary use. See N.J. Rev. Stat. § 56:8-67(1) (2013) (defining "covered item[s]" to exclude "a manual clutch, pressure plate, throw-out bearings, clutch master or slave cylinders") If the Hawai'i legislature intended to exclude "wear items," such as the clutch, they could have done so, but did not. As the commonsense understanding of "transmission" includes the clutch in a vehicle with manual transmission, and the Hawai'i legislature did not exclude "wear items," the clutch and clutch assembly are covered by the warranty.

15

misuse in forty-seven miles.  Accordingly, HFI could not have established by a preponderance that Buyers damaged the clutch due to "abuse or neglect" rendering the HRS § 481J-2(c) warranty inapplicable.

Accordingly, the district court's FOF No. 28 (that Buyers had "failed to sustain their burden of proof that the clutch was damaged or otherwise defective at the time they took possession of the Vehicle") was clearly erroneous.  Likewise, the ICA erred in finding that that FOF No. 28 was not "clearly erroneous."

C.    **The ICA Erred by Finding that HFI was Entitled to Retain the $1,000.00 Deposit to Offset its Costs in Repairing the Clutch**

Buyers argue that the ICA incorrectly held that the district court did not err when it found that HFI did not commit a UDAP violation by retaining Buyers' $1,000.00 deposit.[11]  The district court, and subsequently the ICA, found that HFI was entitled to retain Buyers' deposit, in part, because the purchase agreement contained a term which stated that "If I do not accept delivery of the vehicle I purchased, [HFI] may keep

---

[11]    The district court originally ruled in favor of Buyers on summary judgment for Buyers' third UDAP claim (that the clutch assembly was defective at delivery and HFI was not entitled to retain the $1,000.00 deposit).  However, testimony was presented at trial on this point, and the district court included in its FOF No. 28, that "Plaintiffs have failed to sustain their burden of proof that the clutch was damaged or otherwise defective at the time they took possession of the Vehicle[.]"

my cash deposit as payment for [HFI's] costs." HFI provided evidence, including the testimony of Tabios and HFI's Exhibit Q, that established that it cost HFI $1,110.04 or 1,109.75[12] to replace the broken clutch assembly that, by HFI's own evidence, included the flywheel, clutch, pressure pad, and slave cylinder.

Whether HFI could retain the $1,000.00 deposit depends upon whether the clutch assembly was defective when Buyers took possession of the Vehicle or whether Buyers caused the damage to the clutch assembly in the forty-seven miles they had possession of the Vehicle. In answering this question, the ICA concluded that the district court's finding that "Buyers failed in their burden of proving that the clutch was damaged or otherwise defective when they took possession of the Vehicle" was not "clearly erroneous" because HFI presented substantial evidence that the "clutch was 'burnt'" by Buyers after Buyers received possession of the car.

This finding was erroneous. The evidence established that the entire "clutch assembly" was replaced, not just the clutch pressure pad, due in part to a leaky slave cylinder and a burned flywheel. Moreover, the evidence was uncontested that a leaky hydraulic slave cylinder cannot be caused by use or misuse

---

[12]    HFI's version of the receipt has a handwritten price of $1,109.75. Buyers' version of what appears to be an internal version of the same receipt lists the price as $1,110.04.

17

for forty-seven miles.[13] Evidence that the leaky hydraulic slave cylinder cannot be caused by use or misuse for forty-seven miles[14] in conjunction with evidence that the "clutch assembly" was damaged and needed to be replaced, established that the clutch was damaged or defective when Buyers took possession of the Vehicle.

Both Buyers testified that Lindsey raised concerns about the clutch during the test drive[15] and that HFI told Buyers not to worry, repeating that "it was a high-performance clutch" and, therefore, felt different.[16] Testimony from Buyers' expert witness Moniz suggested that the "soft" clutch that Lindsey

---

[13] Moniz testified that "40 miles additional mileage" on any vehicle would "never, ever" cause the clutch assembly to wear out, "[s]omething must have given way." Likewise, Moniz testified that a failure in the slave cylinder could not be caused by driving for "40 miles" and if it failed during the "40 miles" Buyers drove it, "[i]t must have been coincidental, because I don't think you can drive a car for 40 miles and cause it to leak. It had to have been on its way out."

[14] Expert witness Tabios testified that the entire clutch assembly needed to be replaced because the slave cylinder "had a seepage, so they ended up replacing that. But the main problem on this was the clutch disc was burnt." Tabios also testified that he observed "burn marks on the clutch disc and the fly wheel." The invoice produced by HFI for the repair listed the "description of cause" as "replace flywheel, clutch, and pressure plate; replace clutch slave-leaking; bleed clutch system, top off fluid level." HFI's invoice listed the part number, quantity, and list number for the "new parts" that were installed during the repair, including the "flywheel[,]" a "KIT - CL[,]" a "cylinder[,]" "cylinder ASY - clutch[,]" and "fluid - brake[.]"

[15] Lindsey testified that "you had to feed it a – a lot of gas so it wouldn't stall out[.]"

[16] HFI salesperson Angel Mendias testified that the issues during the test drive were not due to "something wrong with the clutch," rather the issue was "[t]he way [Lindsey] was shifting[.]"

complained of during the test drive was the result of a leaky gasket in the slave cylinder. Thus, this record supports the conclusion that the clutch assembly was damaged or defective when Buyers took possession of the Vehicle and was not damaged as a result of Buyers' use or misuse.

Lindsey's presale concerns about the clutch are evidenced not only by his and Leong's testimony, but also by the "Get Ready Authorization" containing handwritten notes in a box titled "ADDITIONAL AGREEMENTS[.]" The additional agreements stated: "sold as is [and] as equipped" with the circled phrase "have service check clutch cust. states 'soft'" and an "OK" written next to the manager's initials "HV[.]" Accordingly, the evidence demonstrates that Buyers raised concerns after test driving the Vehicle about a "soft clutch"--consistent with a leaky slave cylinder--prior to signing the second Vehicle purchase agreement,[17] and HFI represented that it would "check [the] clutch" as an "additional agreement" to the sale.[18]

The district court, and subsequently the ICA, determined that HRS § 481J-2 did not cover the clutch assembly

---

[17] The handwritten note appears to have been written after the first purchase agreement was signed but before the second purchase agreement was signed.

[18] The ICA did not consider the evidence of the handwritten notation on the Get Ready Authorization.

and that Buyers had "failed in their burden of proving that the clutch was damaged or otherwise defective when they took possession of the Vehicle."

As discussed previously, HRS § 481J-2 explicitly covers the flywheel, gaskets, seals, all lubricated parts, internal parts, and torque converter. The evidence in the record--that the clutch assembly had to be replaced and that damage requiring such replacement would "never, ever" be caused by driving just forty-seven miles--supports the conclusion that the clutch assembly, or at least the slave cylinder, was defective at the time Buyers took delivery of the Vehicle. Put simply, the record does not contain evidence to support the district court's finding that Lindsey, who had life-long experience driving manual transmission vehicles[19] and had over 275,000 miles on the manual clutch of his Ford F-350, would burn out the clutch assembly and cause a slave cylinder leak by driving a high-performance racing vehicle for forty-seven miles. Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 116, 839 P.2d 10, 27-28 (1992) (holding that a "FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been

---

[19] Lindsey testified that he been driving manual transmission vehicles "[s]ince I was 15" and has only owned manual transmission vehicles.

committed"). Consequently, the district court's finding that the warranty for used cars in HRS § 481J-2 did not cover the clutch assembly and that Buyers had "failed in their burden of proving that the clutch was damaged or otherwise defective when they took possession of the Vehicle" was clearly erroneous.

## V. CONCLUSION

For the foregoing reasons, we affirm in part and vacate in part the ICA's March 12, 2020 Judgment on Appeal affirming the district court's March 24, 2015 Order on Motion for Summary Judgment and August 25, 2015 Judgment. The ICA erred when it affirmed the district court regarding Buyers' remaining UDAP claims. Therefore, this case is remanded to the district court for proceedings consistent with this summary disposition order. The ICA's judgment on appeal is affirmed in all other respects.

DATED: Honolulu, Hawai'i, December 10, 2021.

Charles S. Lotsof
for petitioners

Benjamin M. Crepes,
Kevin W. Herring, and
(Michael R. Vieira on
the briefs) for
respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Michael D. Wilson

/s/ Christine E. Kuriyama

21